**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CYNTHIA CORRIE, on their own
behalf and as Personal
Representatives of Rachel Corrie
and her next of kin, including her
siblings; CRAIG CORRIE, on their
own behalf and as Personal
Representatives of Rachel Corrie
and her next of kin, including her
siblings; MAHMOUD OMAR AL
SHO'BI; FATHIYA MUHAMMAD
SULAYMAN FAYED; FAYEZ ALI
MOHAMMED ABU HUSSEIN; MAJEDA
RADWAN ABU HUSSEIN; EIDA
IBRAHIM SULEIMAN KHALAFALLAH,
            *Plaintiffs-Appellants,*

                v.

CATERPILLAR, INC.,
            *Defendant-Appellee.*

No. 05-36210

D.C. No.
CV-05-05192-FDB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued and Submitted
July 9, 2007—Seattle, Washington

Filed September 17, 2007

Before: Arthur L. Alarcón, Michael Daly Hawkins, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

12485

## COUNSEL

Gwynne Skinner and Ronald C. Slye, Seattle University, Ronald A. Peterson Law Clinic, Seattle, Washington; Maria C. LaHood and Jennifer Green, Center for Constitutional Rights, New York, New York; and Erwin Chemerinsky (argued), for the plaintiffs-appellants.

Robert G. Abrams (argued), Howrey LLP, Washington, D.C.; Joanne E. Caruso, Richard J. Burdge, Jr., and David G. Meyer, Howrey LLP, Los Angeles, California; James L. Magee, Graham & Dunn PLC, Seattle, Washington, for the defendant-appellee.

Ronald J. Bettauer, Deputy Legal Adviser, Department of State, Jeffrey Buchwoltz, Acting Assistant Attorney General, John McKay, U.S. Attorney, Douglas N. Letter, Robert M. Loeb (argued), Attorneys, Appellate Staff, Department of Justice, Washington, D.C., for amicus curiae the United States.

Ralph G. Steinhardt, George Washington University Law School, Washington, D.C., for amicus curiae International Law Scholars.

Marco Simons and Richard L. Herz, Earthrights International, Washington, D.C., for amicus curiae Career Foreign Service Diplomats.

Allan Ides, Loyola Law School, Los Angeles, California, for amicus curiae Professors of Constitutional and International Law.

Terry Collingsworth for amicus curiae the International Labor Rights Fund.

Tyler R. Giannini, Human Rights Program of Harvard Law School, Cambridge, Massachusetts, for amicus curiae Law Professors.

Robin S. Conrad and Amar D. Sarwal, National Chamber Litigation Center, Inc., Washington, D.C.; Maria Ghazal, Business Roundtable, Washington, D.C.; Paul R. Friedman, John Townsend Rich, and William F. Sheehan, Goodwin Procter LLP, Washington, D.C., for amicus curiae the Chamber of Commerce of the United States of America and Business Roundtable.

## OPINION

WARDLAW, Circuit Judge:

Plaintiffs Cynthia and Craig Corrie, Mahmoud Al Sho'bi, Fathiya Muhammad Sulayman Fayed, Fayez Ali Mohammed Abu Hussein, Majeda Radwan Abu Hussein, and Eida Ibrahim Suleiman Khalafallah filed this action after their family members were killed or injured when the Israeli Defense Forces ("IDF") demolished homes in the Palestinian Territories using bulldozers manufactured by Caterpillar, Inc., a United States corporation. The IDF ordered the bulldozers directly from Caterpillar, but the United States government paid for them. The district court dismissed the action under Federal Rule of Civil Procedure 12(b)(6), finding it lacked jurisdiction because, *inter alia*, the political question doctrine precludes decision by an Article III court.

Because we agree that plaintiffs' claims present nonjusticiable political questions that deprive the district court of subject matter jurisdiction when construed under Federal Rule of Civil Procedure 12(b)(1), we do not reach the remaining questions presented under state, federal, and international law. Plaintiffs' action cannot proceed because its resolution would require the federal judiciary to ask and answer questions that are committed by the Constitution to the political branches of our government.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.   Facts and Background

### A.   The Allegations in the Complaint

Because this action was dismissed under Federal Rule of Civil Procedure 12(b)(6), we accept all facts alleged in the complaint as true and construe them in the light most favorable to the plaintiffs. *Maduka v. Sunrise Hosp.*, 375 F.3d 909, 911 (9th Cir. 2004).

Following the Six Day War in 1967, Israel occupied and took control of the West Bank and Gaza Strip. Caterpillar is the world's leading manufacturer of heavy construction and mining equipment. Among its customers is the IDF, which since 1967 has utilized Caterpillar bulldozers to demolish homes in the Palestinian Territories. According to plaintiffs' complaint, Caterpillar sold the bulldozers to the IDF despite its actual and constructive notice that the IDF would use them to further its home destruction policy in the Palestinian Territories; a policy plaintiffs contend violates international law. Seventeen members of plaintiffs' families — sixteen Palestinians and one American — were killed or injured in the course of the demolitions.

## B.    Facts Beyond the Complaint[1]

The complaint alleges that Caterpillar sold bulldozers to the IDF, but it does not explain how those bulldozers were financed. There is undisputed evidence in the record, however, that the United States government paid for every bulldozer that Caterpillar transferred to the IDF. Caterpillar submitted an affidavit by Frank Weinberg ("Weinberg Declaration"), General Manager of Caterpillar's Defense & Federal Products division, in which Weinberg states that the United States government has approved and financed all contracts between Israel and Caterpillar dating back to at least 1990, and that Caterpillar "does not sell products to the government of Israel in sales that are not approved by the U.S. government."

Appended to the Weinberg Declaration is a copy of a letter from the Defense Security Cooperation Agency ("DSCA"), an arm of the United States Department of Defense, sent in September 2001 to the Israeli government and copied to Caterpillar ("DSCA letter"). The letter grants "[f]unding approval" for the Israeli government's purchase of fifty Caterpillar D9 bulldozers under the Foreign Military Financing program ("FMF"). Under the FMF, foreign governments enter into contracts directly with American defense contractors and then apply to the DSCA for approval of funding on a case-by-case basis.[2] The DSCA letter also states that the DSCA "find[s] the proposed procurement to be consistent with the purposes of

---

[1]As we discuss *infra*, it is proper to consider facts in the record found outside the complaint because Caterpillar's motion to dismiss argues the presence of a political question, which would deprive us of subject matter jurisdiction.

[2]*See* DSCA, "Guidelines for Foreign Military Financing of Direct Commercial Contracts — January 2005," *at* http://www.dsca.osd.mil/ DSCA_memoranda/fmf_dcc_2005/Guidlines 2005%203.pdf. We take judicial notice of the DSCA's guidelines for implementing the FMF. *See* Fed. R. Evid. 201; *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 332 & n.10 (1961) (taking judicial notice of a government publication).

the Arms Export Control Act," 22 U.S.C. §§ 2751 *et seq.*, which authorizes the FMF, *see id.* § 2763.

Plaintiffs introduced a letter from Matthew Reynolds, the Acting Assistant Secretary of State for Legislative Affairs, indicating that Israel acquired the bulldozers "on a commercial contract basis" financed through the FMF ("Reynolds letter"). At oral argument, plaintiffs did not dispute that the bulldozers were financed under the FMF.

Amicus United States Department of State confirms that "funds requested by the Executive and appropriated by Congress were used by Israel to purchase the equipment in question under the Foreign Military Financing [ ] program."[3]

## C. District Court Proceedings

Plaintiffs filed an action in the district court alleging seven claims against Caterpillar for (1) war crimes; (2) extrajudicial killing under the Torture Victim Protection Act[4]; (3) cruel,

---

[3]The United States did not file a Statement of Interest in the district court. Caterpillar moved for the district court to solicit the State Department's views, but the district court dismissed plaintiffs' claims without ever ruling on that motion. Had the United States filed a Statement of Interest, we would have given it "serious weight." *Sarei v. Rio Tinto*, 487 F.3d 1193, 1205 (9th Cir. 2007) (vacated pending reh'g en banc, 2007 U.S. App. LEXIS 19751 (9th Cir. Aug. 20, 2007)) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004)). The Statement of Interest, however, would not have settled the matter as it remains our "responsibility to determine whether a political question is present, rather than to dismiss on that ground simply because the Executive Branch expresses some hesitancy about a case proceeding." *Id.*

The United States presents its views as an *amicus curiae*. In this posture, we take "considerable interest" in its views regarding a matter impinging upon foreign policy. *Republic of Aus. v. Altmann*, 541 U.S. 677, 701 (2004). While an amicus may not generally introduce new facts at the appellate stage, given the unique circumstances presented here, we credit the government's uncontradicted representation on appeal that it pays for all Caterpillar bulldozers sold to the IDF.

[4]Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, historical and statutory notes).

inhuman, or degrading treatment or punishment; (4) violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*; (5) wrongful death; (6) public nuisance; and (7) negligent entrustment. The gravamen of each claim is that Caterpillar provided the IDF with equipment it knew would be used in violation of international law, and thus aided and abetted those violations. Plaintiffs seek compensatory and punitive damages; declaratory relief; an injunction directing Caterpillar to cease providing equipment to the IDF so long as its illegal practices continue; and costs and attorneys' fees.

Plaintiffs contend we have jurisdiction over the Palestinian plaintiffs' claims under the Alien Tort Statute[5] ("ATS"), 28 U.S.C. § 1350, and over the claims of the relatives of Rachel Corrie, who are American, under the general federal question jurisdiction statute, 28 U.S.C. § 1331.

Caterpillar moved to dismiss the action under Rule 12(b)(6) for failure to state a claim and under the act of state and political question doctrines. The district court granted the motion in a published opinion. 403 F. Supp. 2d 1019 (W.D. Wash. 2005). It held that both the act of state and the political question doctrines precluded it from reaching the merits of the claims. Alternatively, it held that all of plaintiffs' claims failed on the merits.

Plaintiffs timely appeal.

---

[5]Panels of our Court have referred to this statute by no fewer than three different names. *See, e.g.*, *Alperin v. Vatican Bank*, 410 F.3d 532, 541 (9th Cir. 2005) ("Alien Tort Statute"); *Deutsch v. Turner Corp.*, 317 F.3d 1005, 1017 (9th Cir. 2003) ("Alien Tort Claims Act"); *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1377 (9th Cir. 1998) ("Alien Tort Act"). Because the Supreme Court most recently used the appellation "Alien Tort Statute," *Sosa v. Alvarez-Machain*, 542 U.S. at 697, we do so too.

## II.   Standard of Review

We review a district court's dismissal for failure to state a claim or for lack of subject matter jurisdiction de novo. *Arakaki v. Lingle*, 477 F.3d 1048, 1056 (9th Cir. 2007). We may affirm on any basis fairly supported by the record. *United States v. Washington*, 969 F.2d 752, 755 (9th Cir. 1992).

## III.   Political Question Doctrine

We face a threshold procedural hurdle concerning the scope of what we may consider in deciding this appeal. Our political question analysis calls on us to examine the United States government's role in financing the IDF's purchases of Caterpillar bulldozers. But determining that role requires us to look beyond the face of the plaintiffs' complaint and to other evidence in the record. We first consider, therefore, whether the doctrine's limitation on federal courts is jurisdictional, or merely prudential. Only if the doctrine is jurisdictional may we look beyond the facts alleged in the complaint to decide whether this case presents a political question. Because we hold that the political question doctrine is jurisdictional in nature, we proceed, taking into consideration facts beyond the complaint.

### A.

In general, "[t]he focus of any Rule 12(b)(6) dismissal — both in the trial court and on appeal — is the complaint." *Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998). But when a motion to dismiss attacks "the substance of the complaint's jurisdictional allegations," we treat it as brought under Rule 12(b)(1), even if it was "improperly identified by the moving party as brought under Rule 12(b)(6)." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). Under such circumstances, the court may expand its review and "rely on affidavits or any other evidence prop-

erly before the court." *Id*. (citing *Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)).

Plaintiffs' complaint does not reference the government's role in facilitating the sales at issue, but undisputed evidence in the record suggests that the United States pays for every bulldozer the IDF purchases from Caterpillar. Before considering that evidence at the pleadings stage, we must decide whether the presence of a political question deprives a court of subject matter jurisdiction. To the extent the answer to that question is "unclear," *see Arakaki*, 477 F.3d at 1056, we now hold that it does.

The political question doctrine first found expression in Chief Justice Marshall's observation that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). The Supreme Court has since explained that "[t]he nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 211 (1962). *Baker* outlined six independent tests for determining whether courts should defer to the political branches on an issue:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrass-

ment from multifarious pronouncements by various
departments on one question.

*Id*. at 217.

**[1]** The Supreme Court has indicated that disputes involv-
ing political questions lie outside of the Article III jurisdiction
of federal courts. *See Schlesinger v. Reservists Comm. to Stop
the War*, 418 U.S. 208, 215 (1974) ("[T]he concept of justi-
ciability, which expresses the jurisdictional limitations
imposed upon federal courts by the 'case or controversy'
requirement of Art. III, embodies . . . the political question
doctrine[ ]." ) (citing *Flast v. Cohen*, 392 U.S. 83, 95 (1968));
*see also Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir.
2005) ("The principle that the courts lack jurisdiction over
political decisions that are by their nature committed to the
political branches to the exclusion of the judiciary is as old as
the fundamental principle of judicial review.") (internal quo-
tation marks omitted); *No GWEN Alliance of Lane County,
Inc. v. Aldridge*, 855 F.2d 1380, 1382 (9th Cir. 1988) ("[T]he
presence of a political question precludes a federal court,
under [A]rticle III of the Constitution, from hearing or decid-
ing the case presented."). Federal courts' jurisdiction is con-
strained by Article III of the Constitution. Because the
political question doctrine curbs a court's power under Article
III to hear a case, the doctrine is inherently jurisdictional.[6]

**[2]** But some courts and commentators have also posited a
prudential political question doctrine. Justice Powell

---

[6]It is telling that the political question doctrine first found expression in
*Marbury*, the seminal case establishing that the Constitution vests federal
courts with the judicial review function. 5 U.S. (1 Cranch) at 154-73. If
the Constitution generally permits courts to review congressional legisla-
tion and executive action, after all, it makes sense that it would also cir-
cumscribe that power over issues particularly within the province of the
political branches. *Cf.* Akhil Reed Amar, Marbury, *Section 13, and the
Original Jurisdiction of the Supreme Court*, 56 U. Chi. L. Rev. 443, 449-
50 (1989).

expressed his view that "the political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government." *Goldwater v. Carter*, 444 U.S. 996, 1000 (1979) (Powell, J., concurring); *see also Nixon v. United States*, 506 U.S. 224, 252-53 (1992) (Souter, J., concurring) (noting that applying the political question doctrine requires case-by-case attention to "prudential concerns"); *Wang v. Masaitis*, 416 F.3d 992, 996 (9th Cir. 2005) (discussing Justice Powell's approach).

The descriptor "prudential doctrine" is generally reserved for self-imposed restraints that arise at the judiciary's discretion rather than by the command of the Constitution. *Cf. Warth v. Seldin*, 422 U.S. 490, 499-500 (1975) (describing prudential standing requirements as "essentially matters of judicial self-governance"). But prudential considerations cannot substitute for constitutional considerations; rather, they assist in identifying cases the Constitution forbids courts from hearing.

**[3]** Prudential considerations look to the consequences of a court asserting its jurisdiction, while purely constitutional ones look to the text and structure of the Constitution itself for clues about the limitations on a court's Article III powers. Because the Constitution's grants of authority are often set forth in broad strokes, courts often take prudential concerns into account to assist them in the difficult task of discerning which cases the Constitution forbids them from hearing. *See* Rachel E. Barkow, More Supreme Than Court? The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy, 102 Colum. L. Rev. 237, 253-63 (2002). We have accordingly pointed to Justice Powell's view that the first three *Baker* factors focus on the constitutional limitations of a court's jurisdiction, while the final three are "prudential considerations [that] *counsel* against judicial intervention." *Wang*, 416 F.3d at 996 (quoting *Goldwater*, 444 U.S. at 998 (Powell, J., concurring) (emphasis added)). *But see Vatican Bank*, 410 F.3d at 544 ("But these [six *Baker*] tests are more

discrete in theory than in practice, with the analyses often collapsing into one another.") (citing *Nixon*, 506 U.S. at 228-29).

**[4]** In this sense, the political question doctrine may have a prudential element to its application, and it is not a contradiction to speak of the political question doctrine as both prudential and jurisdictional. But it is at bottom a jurisdictional limitation imposed on the courts by the Constitution, and not by the judiciary itself. *See 767 Third Ave. Assocs. v. Consulate Gen. of the Socialist Fed. Republic of Yugo.*, 218 F.3d 152, 164 (2d. Cir. 2000) ("Although prudential considerations may inform a court's justiciability analysis, the political question doctrine is essentially a constitutional limitation on the courts.").

**[5]** We hold that if a case presents a political question, we lack subject matter jurisdiction to decide that question. Caterpillar's Rule 12(b)(6) motion is thus more appropriately construed as a Rule 12(b)(1) motion for dismissal for lack of subject matter jurisdiction to the extent it alleges a nonjusticiable political question. We may therefore look beyond the face of the complaint to determine whether the district court properly dismissed plaintiffs' action under the political question doctrine. *See St. Clair*, 880 F.2d at 201.

**B.**

**[6]** "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative [branches] . . . and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). However, it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. We will not find a political question "merely because [a] decision may have significant political overtones." *Japan Whaling Ass'n v.*

*Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995).

We "undertake a discriminating case-by-case analysis to determine whether the question posed lies beyond judicial cognizance." *Vatican Bank*, 410 F.3d at 545. Nevertheless, "cases interpreting the broad textual grants of authority to the President and Congress in the areas of foreign affairs leave only a narrowly circumscribed role for the Judiciary." *Id*. at 559 (quotation omitted).

**[7]** The decisive factor here is that Caterpillar's sales to Israel were paid for by the United States. Though mindful that we must analyze each of the plaintiffs' "individual claims," *id*. at 547, each claim unavoidably rests on the singular premise that Caterpillar should not have sold its bulldozers to the IDF. Yet these sales were financed by the executive branch pursuant to a congressionally enacted program calling for executive discretion as to what lies in the foreign policy and national security interests of the United States. *See* 22 U.S.C. § 2751 (stating that the purpose of the Arms Export Control Act, which authorizes the FMF program, is to support "effective and mutually beneficial defense relationships in order to maintain and foster the environment of international peace and security essential to social, economic, and political progress").

**[8]** Allowing this action to proceed would necessarily require the judicial branch of our government to question the political branches' decision to grant extensive military aid to Israel. It is difficult to see how we could impose liability on Caterpillar without at least implicitly deciding the propriety of the United States' decision to pay for the bulldozers which allegedly killed the plaintiffs' family members.[7]

---

[7]Plaintiffs cannot plausibly argue that Caterpillar was somehow on notice of IDF policies governing the bulldozers' military utilization while the United States government was not. Much of the "Notice to Caterpillar,

Several of the six *Baker* tests are implicated by the United States government's role in financing the Caterpillar bulldozer purchases by the IDF. We begin with the first: Whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." 369 U.S. at 217. It is well established that " 'the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; [and] that the propriety of the exercise of that power is not open to judicial review.' " *Mingtai Fire & Marine Ins. Co. v. United Parcel Serv.*, 177 F.3d 1142, 1144 (9th Cir. 1999) (quoting *United States v. Pink*, 315 U.S. 203, 222-23 (1942)).

**[9]** Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations. In *Dickson v. Ford*, Dickson challenged the Emergency Security Assistance Act of 1973, which authorized $2.2 billion for military assistance and foreign military sales credit to Israel. 521 F.2d 234, 235 & n.1 (5th Cir. 1975). The Fifth Circuit dismissed the case on political question grounds, noting that both "the Congress and the President have determined that military and economic assistance to the State of Israel is necessary." *Id.* at 236. The court held that "a determination of whether foreign aid to Israel is necessary at this particular time is a 'question uniquely demand[ing] single-voiced statement of the Government's views,' " and is therefore inappropriate for judicial resolution. *Id.* (quoting *Baker*, 369 U.S. at 211); *see also Crockett v. Reagan*, 720 F.2d 1355, 1356-57 (D.C. Cir. 1983) (per curiam); *Atl. Tele-Network v. Inter-Am. Dev. Bank*, 251 F. Supp. 2d 126, 131 (D.D.C. 2003).

---

Inc." discussed in the complaint details United Nations resolutions and statements and human rights organization reports dating back to 1967. It is inconceivable that the United States government would not also have been aware of the IDF practice of demolishing Palestinian homes.

**[10]** We cannot intrude into our government's decision to grant military assistance to Israel, even indirectly by deciding this challenge to a defense contractor's sales.[8] Plaintiffs' claims can succeed only if a court ultimately decides that Caterpillar should not have sold its bulldozers to the IDF. Because that foreign policy decision is committed under the Constitution to the legislative and executive branches, we hold that plaintiffs' claims are nonjusticiable under the first *Baker* test.

Plaintiffs' action also runs head-on into the fourth, fifth, and sixth *Baker* tests because whether to support Israel with military aid is not only a decision committed to the political branches, but a decision those branches have already made. *See Vatican Bank*, 410 F.3d at 544 ("[T]hese tests are more discrete in theory than in practice, with the analyses often collapsing into one another."). The executive branch has made a policy determination that Israel should purchase Caterpillar bulldozers. It advances that determination by financing those purchases under a program authorized by Congress. A court could not find in favor of the plaintiffs without implicitly questioning, and even condemning, United States foreign policy toward Israel.

---

[8]Our holding in *Sarei v. Rio Tinto*, 487 F.3d at 1204, does not provide appellants with shelter from the political question doctrine. The cases are factually unrelated. *Sarei* involved a dispute between an international mining corporation allied with the then government of Papua New Guinea and local residents opposing the actions of the corporation. The United States was implicated in the litigation only through its filing of a Statement of Interest at the request of the district court. This is a sizable step removed from the current proceedings where the United States is a direct actor, having funded Israel's purchase of the bulldozers in question.

We rejected Rio Tinto's argument in *Sarei* that the first *Baker* factor is satisfied for all ATS claims. However, this should not be understood as accepting the inverse proposition that all ATS claims are *per se* immunized from the first *Baker* factor. Here, the ATS claim runs directly afoul of the first *Baker* factor because our review of the claim would be "inextricable" from a review of a foreign policy decision constitutionally committed to the coordinate political departments. *Baker*, 369 U.S. at 217.

In this regard, we are mindful of the potential for causing international embarrassment were a federal court to undermine foreign policy decisions in the sensitive context of the Israeli-Palestinian conflict. Plaintiffs argue that the United States government has *already* criticized Israel's home demolitions in the Palestinian Territories. They point, for example, to former Secretary of State Powell's statement that "[w]e oppose the destruction of [Palestinian] homes — we don't think that is productive." But that language is different in kind from a declaration that the IDF has systematically committed grave violations of international law, none of which the United States has ever accused Israel of, so far as the record reveals. Diplomats choose their words carefully, and we cannot subvert United States foreign policy by latching onto such mildly critical language by the Secretary of State. *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000) ("[T]he nuances of the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court.") (internal quotations omitted).

**[11]** It is not the role of the courts to indirectly indict Israel for violating international law with military equipment the United States government provided and continues to provide. "Any such policy condemning the [Israeli government] must first emanate from the political branches." *Vatican Bank*, 410 F.3d at 561. Plaintiffs may purport to look no further than Caterpillar itself, but resolving their suit will necessarily require us to look beyond the lone defendant in this case and toward the foreign policy interests and judgments of the United States government itself.

We therefore hold that the district court did not err in dismissing the suit under the political question doctrine. Because we affirm on this ground, we do not reach the other issues raised on appeal.

**AFFIRMED.**[9]

---

[9]Caterpillar's Request for Judicial Notice, filed June 7, 2006, is denied.